**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                  Case No. 3:13-cv-1210-J-39PDB

REAL PROPERTY, INCLUDING ALL
IMPROVEMENTS THEREON AND
APPURTENANCES THERETO,
LOCATED AT 246 MAIN STREET,
DANSVILLE, LIVINGSTON COUNTY,
NEW YORK, et al.

      Defendants.

_____/

## ORDER

      This is a civil forfeiture action in which the United States seeks to forfeit three

pieces of real property that it contends were purchased with proceeds traceable to wire

fraud and because they were involved in a wire fraud transaction.[1]  The case arises out

of a criminal investigation into Daniel Williams[2] who, the Government alleges, defrauded

a number of investors through an elaborate embezzlement scheme lasting from at least

---

[1] "Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States.  18 U.S.C. § 981(a)(1)(C).  "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) to include any act constituting an offense listed in 18 U.S.C. § 1961(1), which in turn lists 18 U.S.C. § 1343 as the offense for wire fraud.  Additionally, any property involved in a transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property, is subject to forfeiture.  18 U.S.C. § 981(a)(1)(A).  A violation of 18 U.S.C. § 1957 includes knowingly engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity — here, wire fraud.  18 U.S.C. § 1957(a).

[2] Mr. Williams is the Defendant in <u>United States v. Williams</u>, 3:13-cr-00200-TJC-JBT, and he is a fugitive.

July 2011 through about February 2013.  See generally (Declaration of Agent J. Douglas Mathews, Doc. 1-1).  The Government maintains that Mr. Williams purchased the three Defendant properties, in whole or in part, with funds traceable to the illicit scheme.

The Court has entered Final Judgments of Forfeiture as to two of the three Defendant properties.  First, on March 5, 2015, the Court granted the United States' motion for final judgment of forfeiture as to Defendant "Real Property, including all improvements thereon and appurtenances thereto, located at 246 Main Street, Dansville, Livingston County, New York" (hereinafter, "Main Street Property").  See (Judgment of Forfeiture, Doc. 43).  Second, on March 18, 2015, the Court granted the United States' motion for final judgment of forfeiture as to Defendant "Real Property, including all improvements thereon and appurtenances thereto, located at Section 148 Block 1 Lot 20.212, Parker Hill Road, Sparta, Livingston County, New York" (hereinafter, "Parker Hill Property").  See (Judgment of Forfeiture, Doc. 50).  The only remaining Defendant is "Real Property, including all improvements thereon and appurtenances thereto, located at 26 Health Street, Dansville, Livingston County, New York" (hereinafter, "Health Street Property").

Claimant Scott Stern, an interested party, has filed an Answer and Affirmative Defenses, alleging, in pertinent part, that he is an innocent owner of the Health Street Property within the meaning of 18 U.S.C. § 983(d)(1).  See (Answer, Doc. 13 at 3). Attached to Claimant Stern's Answer and Affirmative Defenses is the Verified Claim of Scott Stern ("Claim"), wherein he claims that he acquired fee simple title to the Health Street Property by way of quit claim deed executed by Daniel Williams on August 23,

2013.  See (Claim, Doc. 13-1).  Attached to Mr. Stern's Claim is the quit claim deed at issue.

The case is now before the Court on cross-motions for summary judgment as to Claimant Stern's status as an innocent owner of the Health Street Property.  See (Claimant Scott Stern's Motion for Summary Judgment, Doc. 37); (United States' Motion for Summary Judgment, Doc. 39).  Both parties have responded in opposition to each other's motions.  See (United States' Response to Scott Stern's Motion for Summary Judgment, Doc. 47); (Claimant Scott Stern's Response to the United States' Motion for Summary Judgment, Doc. 51).  As such, the matters are now ripe for adjudication.

## I.    FACTUAL BACKGROUND

The relevant facts are undisputed.  This civil forfeiture action arises out of an on-going criminal investigation into the defrauding of individual investors in connection with an elaborate scheme allegedly perpetrated by Daniel Williams through his management position in American Pine and Rosin Derivatives, LLC d/b/a Global Pine ("Global Pine"). (J. Douglas Mathews Decl., Doc. 1-1 ¶ 2).  More specifically, the United States alleges that, from at least July 2011 through about February 2013, Williams used fake vendor invoices to trick corporate investors into believing that the invoices submitted to Global Pine were for legitimate business expenses when, in reality, they paid for Williams' personal expenses and extravagant lifestyle.  (Id. ¶¶ 2, 4).  The United States contends that the properties to be forfeited were purchased, in whole or in part, with funds embezzled from Global Pine.  (Id. ¶¶ 3, 21-25).

Stern met Williams on a train from Philadelphia to New York in December of 2009. (Stern Decl., Doc. 37-1 ¶ 4).  At that time, Williams represented to Stern that he was an

entrepreneur and venture capitalist. (Id. ¶ 5). Approximately six months after this encounter, Williams called Stern to propose that Stern invest in a company in which Williams was involved called MediTalk Devices, LLC ("MediTalk"). (Id. ¶ 6). During the call, Williams informed Stern that, in 2002, Williams had sold a company in England for $110 million, and that he owned 25% of the company at the time of the sale. (Id. ¶ 7). Based on Williams' representations, Stern believed that Williams was a wealthy businessman. (Id. ¶ 8).

Stern invested in MediTalk, and later in other companies that Williams proposed, including Career Lynx, LLC ("CareerLynx"), Red Lion Holdings, LLC ("Red Lion"), and Danz, LLC ("Danz"). (Id. ¶¶ 9-10). Nevertheless, this business relationship soon fell apart. In March of 2013, one of Williams' other investors contacted Stern and informed Stern that he suspected that Williams was defrauding his investors. (Id. ¶ 11). Subsequent to this conversation, Williams admitted to Stern that he had defrauded Stern out of his investment in each of the above entities. (Id. ¶ 12).

Stern and Williams decided to attempt to unwind any wrongdoing. In order to settle any possible claims for fraud, Stern and Williams executed three settlement agreements. (Id. ¶ 13). One of the agreements, referred to as the MediTalk Settlement Agreement, required Williams to pay to Stern $160,800 in return for an assignment of Stern's interest in MediTalk to Williams and Stern's full and complete release of claims. (Id. ¶ 14); (MediTalk Settlement Agreement, Doc. 37-1 at 5-7). The MediTalk Settlement Agreement provided that, for payment of the $160,800 due, in whole or in part, Williams would quit claim his interest in the Health Street Property to Stern. (Stern Decl., Doc. 37-

- 4 -

1 ¶ 15).   Williams executed the MediTalk Settlement Agreement on May 17, 2013. (MediTalk Settlement Agreement, Doc. 37-1 at 5-7).

On July 12, 2013, Stern filed suit against Williams in the United States District Court, Eastern District of Missouri, alleging inter alia that Williams failed to fulfill his obligations under each of the settlement agreements.  (Order Taking Judicial Notice of Certain Facts, Doc. 27 at 2; Docket, Doc. 24-1).  While the suit was pending, on August 23, 2013, Williams executed a quit claim deed to Stern for the Health Street Property, consistent with his obligations under the MediTalk Settlement Agreement.  (Quit Claim Deed, Doc. 37-1 at 8-10); (Stern Decl., Doc. 37-1 ¶17).  Williams mailed the quit claim deed shortly after executing it, and it was received by Stern's counsel in St. Louis on September 3, 2013.  (Stern Aff. In Support of Default Judgment, Doc. 37-2 ¶ 32). Williams, however, did not provided to Stern signed copies of all of the required tax documents necessary to record the quit claim deed.  (Id. ¶ 33).

On April 17, 2014, Stern obtained a final default judgment in his favor in his case against Williams in the Eastern District of Missouri.  (Order Taking Judicial Notice of Certain Facts, Doc. 27 at 2; Default Judgment, Doc. 24-2).  In the Final Judgment, the court found that Williams had executed a quit claim deed for the Health Street Property, but that he failed to execute other necessary documents to finalize the transaction.  (Order Taking Judicial Notice of Certain Facts, Doc. 27 at 2; Default Judgment, Doc. 24-2 at 4). Accordingly, the court ordered Williams to execute the tax documents so that the quit claim deed could be recorded.  (Order Taking Judicial Notice of Certain Facts, Doc. 27 at 2; Default Judgment, Doc. 24-2 at 4).

Stern has attempted to contact Williams on multiple occasions and has requested that Williams sign the necessary tax documentation, but to no avail. (Stern Aff. In Support of Default Judgment, Doc. 37-2 ¶¶ 37-38).   The necessary tax documents remain unexecuted, and the Livingston County Recorder of Deeds has refused to accept the quit claim deed for recording without executed copies of the necessary tax documents from Williams.  (Id. ¶ 40).

At the time he entered into the Settlement Agreements and obtained the quit claim deed, Stern believed that Williams' ownership of the Health Street Property was entirely legitimate and completely unrelated to any of Williams' fraudulent activities.  (Stern Decl. ¶ 19).  Stern did not believe or know that Williams had used money from any of his frauds to purchase the Health Street Property.  (Id. ¶ 20).  Rather, Stern understood that Williams was a wealthy man who had other funds available and that Williams used those other funds to purchase the Health Street Property.  (Id. ¶ 21).  Although Williams admitted to Stern that he had defrauded Stern, Williams never told Stern that he had used funds from Stern or his other investors to purchase the Health Street Property.  (Id. ¶ 22).

The United States filed the instant action on October 7, 2013, a little more than a month after Williams delivered to Stern the quit claim deed for the Health Street Property. (Verified Complaint for Forfeiture In Rem, Doc. 1); (Stern Decl., Doc. 37-1 ¶ 17); (Stern Aff. In Support of Default Judgment, Doc. 37-2 ¶ 32).  The first indication that Stern had that Williams purchased the Health Street Property with funds tainted by fraud was after Stern learned that the Government had initiated this civil forfeiture action.  (Stern Decl., Doc. 37-1 ¶ 23).

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[3] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

---

[3] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."   Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

The above standard is not affected by the filing of cross-motions for summary judgment. Mobile Cnty. Water, Sewer & Fire Prot. Auth., Inc. v. Mobile Area Water & Sewer Sys., Inc., 567 F. Supp. 2d 1342, 1348 (S.D. Ala. 2008), aff'd 564 F.3d 1290 (11th Cir. 2009). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984). Nevertheless, "cross-motions may be probative of the non-existence of a factual dispute." Id.

## III.   DISCUSSION

The only issue currently before the Court is whether Claimant Stern is entitled to innocent owner status as to the Health Street Property.  See (Claimant Scott Stern's Motion for Summary Judgment, Doc. 37 at 1-2) (stating that Stern "moves the Court for summary judgment with respect to his status as an innocent owner of [the Health Street Property]."); (United States' Motion for Summary Judgment, Doc. 39 at 18) ("[T]he Government requests that the Court grant summary judgment on the innocent-owner defense in paragraphs one through twelve of the Answer and Affirmative Defenses of Claimant Scott Stern under Federal Rule of Civil Procedure 56.").[4]

Congress has determined that "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute."  18 U.S.C. § 983(d)(1).  In order to assert the "innocent owner" defense, an individual must first qualify as an "owner," as defined by the statute, with an ownership interest in the property "including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest."  18 U.S.C. § 983(d)(6)(A); see United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo-Prop Aircraft, Venezuelan Registration No. YV219T, Serial UC118, 619 F.3d 1275, 1277 n.3 (11th Cir. 2010) [hereinafter 1990 Beechcraft] (stating that ownership is an element of the innocent owner's claim on the merits, and not a part of the standing inquiry).  Then, the requirements for "innocent owner" status depend on whether the

_____

[4] When the Government seeks forfeiture, it bears the burden of proof to establish, by a preponderance of the evidence, that the property is subject to forfeiture.  18 U.S.C. § 983(c)(1).  If the Government is able to meet its burden, then the burden shifts to the claimant to establish the innocent owner defense.  18 U.S.C. § 983(d)(1).  In the United States' Motion for Summary Judgment, the Government only seeks summary judgment on Claimant Stern's innocent-owner defense.  See generally (United States' Motion for Summary Judgment, Doc. 39).

property interest was "in existence at the time the illegal conduct giving rise to forfeiture took place" or whether the "property interest [was] acquired after the conduct giving rise to the forfeiture has taken place." Compare 18 U.S.C. § 983(d)(2)(A), with 18 U.S.C. § 983(d)(3)(A). Where, as here, an individual claims innocent owner status as to "a property interest acquired after the conduct giving rise to the forfeiture has taken place, the term 'innocent owner' means a person who, at the time that person acquired the interest in the property[,]" meets the following two criteria. 18 U.S.C. § 983(d)(3)(A). First, the individual "was a bona fide purchaser or seller for value." 18 U.S.C. § 983(d)(3)(A)(i). Second, the individual "did not know and was reasonably without cause to believe that the property was subject to forfeiture." 18 U.S.C. § 983(d)(3)(A)(ii). The individual claiming innocent owner status bears the burden of proving that he is an innocent owner by a preponderance of the evidence. 18 U.S.C. § 983(d)(1).

The parties dispute whether Stern is entitled to innocent owner status under this standard. On one hand, Stern claims that he is the owner of the Health Street Property, he was a bona fide purchaser of the property for value, and he came into possession of the property without knowledge or reason to believe that the property was subject to forfeiture. See generally (Claimant Scott Stern's Motion for Summary Judgment, Doc. 37 at 2); (Claimant Scott Stern's Response to the United States' Motion for Summary Judgment, Doc. 51). On the other hand, the United States contends that Stern has not established that his interest in the Health Street Property provides him with Article III or statutory standing to pursue his claim, Stern is not a bona fide purchaser of the property, and the material facts show that Stern had reasonable cause to believe that the property was subject to forfeiture. See generally (United States' Motion for Summary Judgment,

- 10 -

Doc. 39); (United States' Response to Scott Stern's Motion for Summary Judgment, Doc.
47). The Court will address each contention in turn.

### A.     Standing.

Initially, the United States' Motion for Summary Judgment mentions standing in
passing, but stops short of arguing that Stern lacks standing to pursue his claim.  See
(United States' Motion for Summary Judgment, Doc. 39 at 7). In terms of actual argument
on the standing issue, all the motion states is that "[t]he United States disputes that Stern
has statutory standing in this action and likely will be filing a motion to strike his claim."
(Id.).  No such motion to strike Stern's claim has been filed.

Nevertheless, in its response to Scott Stern's Motion for Summary Judgment, the
United States argues that "Stern is not entitled to Summary Judgment since he has not
established that his interest in the defendant property provides him with Article III or
statutory standing."  (United States' Response to Scott Stern's Motion for Summary
Judgment, Doc. 47 at 5).   According to the United States, Stern has come forward with
an assertion of ownership, but has failed to demonstrate dominion and control over the
Health Street Property.  (Id.).  In support of this contention, the United States submits that
Stern is a Missouri resident and does not live at the Health Street Property, and that the
United States Marshals Service commented that the "building was vacant" when it posted
notice at the residence.  (Id. at 5-6).  This, the United States submits, is relevant to
standing.

The United States' argument confuses the concepts of "standing" with "ownership,"
which are distinct under Eleventh Circuit law.  The statutory definition of "owner" excludes
"a nominee who exercises no dominion or control over the property."   18 U.S.C. §

- 11 -

983(d)(6)(B)(iii).   The reason for this exclusion is that "people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name."   United States v. A Single Family Residence & Real Prop. Located at 900 Rio Vista Blvd., Fort Lauderdale, 803 F.2d 625, 630 (11th Cir. 1986) (citation omitted).   But ownership is not what is at issue now; it is standing.   To bolster its argument that standing requires dominion and control over the property, the United States cites United States v. One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft, 659 F. Supp. 2d 1260, 1261 (S.D. Fla. 2009) for the proposition that, there, the district court concluded "that a corporation lacked statutory standing because it exercised no dominion or control over the property under § 983(d)(6), even though it had valid legal title to the property." (United States' Response to Scott Stern's Motion for Summary Judgment, Doc. 47 at 2).   What the United States omits is that the Eleventh Circuit rejected this approach.   In affirming the Southern District of Florida's decision, the Eleventh Circuit, in a footnote, stated as follows:

> The district court cast its ruling in terms of "statutory standing," reasoning that because International Aviation was not the "owner" of the plane, it lacked "statutory standing" to raise the innocent owner defense at all. "Although many cases refer to [the statutory definition of ownership] as part of the 'standing' inquiry, it is in fact an element of the innocent owner's claim on the merits," United States v. One Lincoln Navigator 1998, 328 F.3d 1011, 1014 (8th Cir.2003), and we treat it as such throughout this opinion.

1990 Beechcraft, 619 F.3d at 1277 n.3 (brackets in original).[5]   While it is true that a claimant must demonstrate both Article III standing and statutory standing in order to

---

[5] The Court is mindful that the Eleventh Circuit had previously stated that "possession of bare legal title by one who does not exercise dominion and control over the property is insufficient to even establish standing to challenge a forfeiture."  A Single Family Residence & Real Prop. Located at 900 Rio Vista Blvd., Fort Lauderdale, 803 F.2d

contest a civil forfeiture action, <u>United States v. $38,000.00 Dollars in U.S. Currency</u>, 816

F.2d 1538, 1544 (11th Cir. 1987) ("In addition to establishing Article III standing, claimants

also must satisfy applicable statutory standing requirements."), standing and ownership

come into play at different stages in civil forfeiture cases and require different showings.

<u>United States v. Assets Described in Attachment A to the Verified Complaint Forfeiture In</u>

<u>Rem</u>, 799 F. Supp. 2d 1319, 1323 (M.D. Fla. 2011) ("As the Eleventh Circuit recently

noted, 'standing' and 'ownership' are distinct concepts in civil forfeiture law." (citing <u>1990</u>

<u>Beechcraft</u>, 619 F.3d at 1277 n.3)).   The United States' argument that Stern lacks

standing because he cannot demonstrate that he fits the statutory definition of "owner"

simply lacks merit.  <u>Id.</u> (stating same).

 To establish Article III standing, a claimant merely must demonstrate "a legally

cognizable interest in the property that will be injured if the property is forfeited to the

---

at 630.  As set forth above, the Eleventh Circuit in <u>1990 Beechcraft</u> clarified that the
statutory definition of ownership is not relevant to the standing inquiry.  619 F.3d at 1277
n.3.  Rather, as the Eleventh Circuit stated, the statutory definition, including its "dominion
and control" provision, is relevant to the innocent owner defense on the merits, and courts
that had previously referred to the statutory definition as part of the standing inquiry were
stating, in effect, that the claimant had failed to establish on the merits a property interest
entitling him to relief.  <u>See id.</u>; <u>see</u> <u>United States v. Assets Described in Attachment A to</u>
<u>the Verified Complaint Forfeiture In Rem</u>, 799 F. Supp. 2d 1319, 1323 (M.D. Fla. 2011)
("As the Eleventh Circuit recently noted, 'standing' and 'ownership' are distinct concepts
in civil forfeiture law." (citing <u>1990 Beechcraft</u>, 619 F.3d at 1277 n.3)); <u>see also</u> <u>United</u>
<u>States v. One Lincoln Navigator 1998</u>, 328 F.3d 1011, 1014 (8th Cir. 2003) ("When
claimants have Article III standing but fail to prove an ownership interest that meets these
statutory criteria, the 'statement that Claimants lacked 'standing' is simply another way of
stating that Claimants had failed to establish on the merits a property interest entitling
them to relief.'" (citation omitted)); <u>United States v. Hooper</u>, 229 F.3d 818, 820 (9th Cir.
2000) ("The district court's concluding statement that Claimants lacked 'standing' is simply
another way of stating that Claimants had failed to establish on the merits a property
interest entitling them to relief.").  In any event, as will be discussed <u>infra</u> Part III(B),
Claimant Stern has offered sufficient evidence to establish that he is not merely "a
nominee who exercises no dominion or control over the property."    18 U.S.C. §
983(d)(6)(B)(iii).

government." $38,000.00 Dollars in U.S. Currency, 816 F.2d at 1543 n.12.  Otherwise, there is no "case or controversy" capable of adjudication in the federal courts.  Id. at 1543. The Eighth Circuit in United States v. One Lincoln Navigator 1998, which the Eleventh Circuit in 1990 Beechcraft cited with approval, recognized that the burden of showing Article III standing is "not rigorous."   328 F.3d 1011, 1013 (8th Cir. 2003).  "To have standing, a claimant need not prove the underlying merits of the claim. The claimant need only show a colorable interest in the property, redressable, at least in part, by a return of the property."  Id. (citation omitted); see United States v. 5 S 351 Tuthill Rd., Naperville, Ill., 233 F.3d 1017, 1022 (7th Cir. 2000) (articulating the Article III standing dispute as "whether Bochnewych, who does not own or control the land or its sale price, faces an immediate threat of injury if the land is forfeited" and concluding that his interest "is more than enough to give him an actual stake in the outcome of the suit.").  In fact, the Eleventh Circuit has stated that a claimant need not have an ownership interest in property to have Article III standing, a lesser property interest will suffice.   $38,000.00 Dollars in U.S. Currency, 816 F.2d at 1544 (11th Cir. 1987) ("A claimant need not own the property in order to have standing to contest its forfeiture; a lesser property interest, such as a possessory interest, is sufficient for standing.").  Injury is the measuring stick.  See Via Mat Int'l S. Am. Ltd. v. United States, 446 F.3d 1258, 1262 (11th Cir. 2006) ("At the heart of Article III standing is the existence of an injury, not ownership.").

Stern easily satisfies this undemanding standard.  The United States contends that Claimant Stern holds bare legal title to the Health Street Property, and does not exercise dominion or control over the property.  (United States' Response to Claimant Stern's Motion for Summary Judgment, Doc. 47 at 5).  Even if this "bare legal title" theory were

supported by the record — which, as discussed <u>infra</u> Part III(B), it is not — it is relevant to the statutory definition of "ownership," not Article III standing.  <u>One Lincoln Navigator 1998</u>, 328 F.3d at 1013 ("In these circumstances, although there is evidence that Andrews has only 'bare legal title,' we conclude that is sufficient to confer Article III standing to contest the forfeiture."); <u>see</u> <u>1990 Beechcraft</u>, 619 F.3d at 1277 n.3.  Here, the undisputed evidence shows that Stern has a deed making him the owner of the Health Street Property.[6]  He stands to lose his interest in the property if the United States prevails. Consequently, Claimant Stern has shown a legally cognizable interest in the Health Street Property that would be injured if the property is forfeited to the government.  The injury he would suffer is real, direct, and sufficient under Article III.

Likewise, whether Stern is an "owner" of the Health Street Property is irrelevant to "statutory standing."    <u>Assets Described in Attachment A to the Verified Complaint Forfeiture In Rem</u>, 799 F. Supp. 2d at 1323 (rejecting the same argument and stating "whether Kinetic is an 'owner' is not germane to the issue of whether it has statutory standing to contest the forfeiture."); <u>see</u> <u>1990 Beechcraft</u>, 619 F.3d at 1277 n.3.  The touchstone for statutory standing is compliance with 18 U.S.C. § 983(a)(4) and the Supplemental Rules.  See <u>$38,000.00 Dollars in U.S. Currency</u>, 816 F.2d at 1545 ("The Supplemental Rules govern judicial forfeiture proceedings and establish the statutory

---

[6] Under New York law, "[i]t is well established that transfer of title is accomplished only by the delivery and acceptance of an executed deed."  <u>McLoughlin v. McLoughlin</u>, 237 A.D.2d 336 (N.Y. App. Div. 1997); <u>see</u> <u>Janian v. Barnes</u>, 284 A.D.2d 717, 718 (N.Y. App. Div. 2001) ("A transfer of real property is effected by the delivery of an executed deed to a grantee . . . .").  The United States does not contest that Stern has a legally valid property interest in the Health Street Property.  (United States' Response to Scott Stern's Motion for Summary Judgment, Doc. 47 at 5) ("The United States does not dispute that under New York law, Stern's interest in the defendant real property may be legally valid . . . .").  That alone resolves the Article III issue.

standing requirements for these actions."); see also United States v. $12,126.00 in U.S. Currency, 337 F. App'x 818, 820 (11th Cir. 2009) ("We have emphasized that claimants must strictly adhere to the procedural requirements of the Supplemental Rules to achieve statutory standing to contest a forfeiture action."); United States v. One 2003 Ford Mustang, VIN 1FAFP45X23F316865, No. CIV.A. 12-0670-CG-M, 2013 WL 3833030, at *1 (S.D. Ala. July 23, 2013) ("The Supplemental Rules and 18 U.S.C. § 983(a)(4) 'govern civil forfeiture actions and establish standing requirements for contesting forfeiture.'"); United States v. One Parcel of Real Prop. Located at 19127 SW 65th St., Pembroke Pines, Broward Cnty., Fla., No. 12-61226-CIV, 2013 WL 1023506, at *2 (S.D. Fla. Mar. 14, 2013) ("Statutory standing, on the other hand, refers to a claimant's compliance with the procedural requirements for bringing a claim under federal forfeiture statutes and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture ("Supplemental Rules").").

Here, Stern has statutory standing because he complied with the requirements of 18 U.S.C. § 983(a)(4) and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Supplemental Rule G governs civil forfeiture actions arising in rem from a federal statute. Supp. R. G(1). Rule G requires a person who asserts an interest in a defendant property to contest the forfeiture by filing a claim in the court where the action is pending. Supp. R. G(5)(a). The claim must identify the specific property claimed, identify the claimant and state the claimant's interest in the property, be signed by the claimant under penalty of perjury, and be served on the government's attorney. Supp. R. G.(5)(a)(i)(A)-(D). A claimant must also file an answer to the United States' complaint or a Rule 12 motion within 21 days of filing a claim. Supp. R. G(5)(b). Stern

has complied with these requirements, as evidenced by his Answer and Claim, see generally (Answer, Doc. 13); (Claim, Doc. 13-1), and the United States has not argued otherwise, except for the erroneous contention that Stern's "dominion and control" over the Health Street Property is relevant to statutory standing.

In sum, Stern has Article III standing and statutory standing to contest the forfeiture.

### B.   Ownership under 18 U.S.C. § 983(d)(6).

In order for a claimant to assert that property should not be forfeited because he is an innocent owner, the claimant must prove, by a preponderance of the evidence, 18 U.S.C. § 983(d)(1), that he is both innocent and an owner, id. § 983(d)(3)(A), (d)(6). In pertinent part, ownership requires that the individual have "an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest," id. § 983(d)(6)(A), and that the claimant be more than "a nominee who exercises no dominion or control over the property," id. § 983(d)(6)(B)(iii). Ownership interests are defined by state law, but federal law determines whether a claimant is a nominee who exercises no dominion or control over the property. See One Lincoln Navigator 1998, 328 F.3d at 1015 ("Ownership interests are defined by state law with one important exception—Congress has declared that 'a nominee who exercises no dominion or control over the property' may not be an innocent owner." (citation omitted)).

The Eleventh Circuit has stated that exercising some dominion or control suffices to prove that a claimant is not a mere nominee. 1990 Beechcraft, 619 F.3d at 1278. That requirement "ensures that claimants have at least some actual connection to the property

in question . . . [and are not] bare title holders." Id. at 1279.  In 1990 Beechcraft, the appellant appealed a district court decision ordering forfeiture of a Beechcraft airplane, to which appellant held legal title.  Id. at 1276.  The United States and the appellant stipulated that the airplane carried cocaine from Venezuela into the United States and was therefore subject to forfeiture.  Id.  The appellant, however, contested the forfeiture, claiming to be an "innocent owner."  Id. 1276-77.  After an evidentiary hearing, the district court found that the appellant was not an "owner" for purposes of 18 U.S.C. § 983(d)(6), and was therefore not an innocent owner of the plane.  Id. at 1277.  The issue before the Eleventh Circuit was whether the district court erred in finding that the appellant was a nominee who exercised no dominion or control over the airplane, so as to fall within the exclusion to ownership listed in section 983(d)(6)(B)(iii).  Id.  Appellant argued that because it exercised some dominion and control over the plane, it was not a nominee. Id.  The Eleventh Circuit agreed in part, concluding that the plain language of the statute "clearly provides that a claimant must be more than a 'nominee who exercises no dominion or control.'"  Id. at 1278 (emphasis in original) (citing 18 U.S.C. § 983(d)(6)(B)(iii)).  Thus, the Eleventh Circuit stated that "exercising some dominion or control suffices to prove that a claimant is not a mere nominee.  To hold otherwise would be to substitute [the court's] judgment for Congress's, thereby weakening the substantive protections Congress set out in the statute."  Id. (emphasis in original).  Nevertheless, the Eleventh Circuit held that "it must be the claimant who exercises that dominion or control." Id. (emphasis in original).  In 1990 Beechcraft, the appellant failed to meet its burden of proving, by a preponderance of the evidence, that it, rather than a third-party exercised

any dominion or control over the airplane at all. Id. at 1279. Therefore, the Eleventh Circuit affirmed.

Applying the pertinent authorities to the facts of this case reveals that Stern easily meets the definition of "owner" set forth in 18 U.S.C. § 983(d)(6). Here, Stern has a valid assignment of an ownership interest in the Health Street Property — in fact, he has accepted an executed deed making him the owner of the property. See (Claim, Doc. 13-1 at 6-10). Under New York law, it is irrelevant that Stern has not recorded the deed. See supra note 6 and accompanying text.

Although set forth in its discussion regarding standing, the United States does not contest that Stern has valid legal title to the Health Street Property, but rather argues that he has no "dominion or control" over the property so as to fall within the exclusion to ownership listed in 18 U.S.C. § 983(d)(6)(B)(iii). (United States' Response to Scott Stern's Motion for Summary Judgment, Doc. 47 at 5) ("The United States does not dispute that under New York law, Stern's interest in the defendant real property may be legally valid . . . [but] [t]here is no indication in the record that he exercises dominion or control over the property, because he does not."). The undisputed facts belie that notion. Here, Stern has attempted to record his deed, but the Livingston County Recorder of Deeds has refused to accept the deed for recording without executed copies of the necessary tax documents from Williams. (Stern Aff. In Support of Default Judgment, Doc. 37-2 ¶ 40). The only reason that Stern has not been able to record his deed is that Williams has failed or refused to sign all the necessary documents. (Id. ¶ 39); (Transmittal from Office of Livingston County Clerk, Doc. 39-1 at 32). Indeed, Stern has contacted Williams on multiple occasions to request that Williams sign the necessary tax documentation, see

(Stern Aff. In Support of Default Judgment, Doc. 37-2 ¶ 37); (Email from Stern to Williams, Doc. 39-1 at 31), but Williams has failed or refused to do so.  Additionally, on July 12, 2013, Stern filed suit against Williams in the United States District Court, Eastern District of Missouri, alleging inter alia that Williams failed to fulfill his obligations under each of the settlement agreements, and seeking specific performance in the form of an order requiring Williams to execute the necessary documents to effectuate full transfer of the Health Street Property.  (Order Taking Judicial Notice of Certain Facts, Doc. 27 at 2; Docket, Doc. 24-1).  On April 17, 2014, Stern obtained a final default judgment in his favor in his case against Williams, wherein the District Court for the Eastern District of Missouri found that Williams had executed a quit claim deed for the Health Street Property, but that he failed to execute other necessary documents to finalize the transaction.  (Order Taking Judicial Notice of Certain Facts, Doc. 27 at 2; Default Judgment, Doc. 24-2 at 4). Accordingly, the court ordered Williams to execute the necessary tax documents.  (Order Taking Judicial Notice of Certain Facts, Doc. 27 at 2; Default Judgment, Doc. 24-2 at 4).

The record is laden with facts concerning Stern's dominion and control over the Health Street Property.  By way of illustration, it is Stern who negotiated the settlement agreement for the Health Street Property, (Stern Aff. In Support of Default Judgment, Doc. 37-2 ¶¶ 7-17); it is Stern who counter-signed copies of the settlement agreement for the Health Street Property, (Email from Stern to Williams, Doc. 39-1 at 25); it is Stern who attempted to record his interest in the Health Street Property, (Stern Aff. In Support of Default Judgment, Doc. 37-2 ¶ 40); it is Stern who brought a lawsuit to compel a full transfer of the Health Street Property, (Order Taking Judicial Notice of Certain Facts, Doc. 27 at 2); it is Stern who obtained a Judgment regarding the Health Street Property,

(Default Judgment, Doc. 24-2 at 4); it is Stern who holds title to the Health Street Property, (Claim, Doc. 13-1); and it is Stern who has hired counsel to represent his interest in the Health Street Property in these proceedings.  The undisputed facts establish that Stern exercises — at the very minimum — some dominion or control over the Health Street Property, which is sufficient under Eleventh Circuit law.  1990 Beechcraft, 619 F.3d at 1279 ("International Aviation argues that it meets the statutory criteria because it exercised some dominion and control when it signed the aircraft's ownership documents, held title to the aircraft, signed the aircraft's lease, reviewed the flight logs of the airplane, and supervised the repairs of the aircraft while it was leased. If it had indeed been International Aviation that had performed the afore-mentioned tasks, we would agree that the company exercised some dominion and control over the plane." (emphasis in original)).  The most illuminating fact in the record is that on July 12, 2013 Stern filed suit against Williams in federal district court and, as the owner of the Health Street Property, he sought and obtained a default judgment in his favor which required Williams to sign and date the pertinent documents so that Stern could record, market, and sell the Health Street Property as its true owner.  See (Default Judgment, Doc. 24-2 ¶ 4(d)).  A mere "nominee" — which the Eleventh Circuit has stated "connotes the delegation of authority to the nominee in a representative or nominal capacity only," United States v. Weiss, 467 F.3d 1300, 1303 n.1 (11th Cir. 2006) — would have no reason to sue and obtain a judgment compelling full transfer to him of the property at issue.  Stern's conduct not only evidences some dominion and control over the Health Street Property, it shows that Stern is its true owner.  Additionally, unlike in 1990 Beechcraft, the United States has pointed to no facts showing that anyone else other than Stern exercises dominion and control

- 21 -

over the Health Street Property. Here, Stern is the owner of the property, and the record before the Court indicates that he has acted like it.

In sum, Stern is not a mere "nominee who exercises no dominion or control over the property." Stern is an "owner" as defined by 18 U.S.C. § 983(d)(6).

### C.    Stern was a bona fide purchaser for value.

As applicable here, the first prong of the innocent owner defense requires that, at the time the person acquired the interest in the property, he was a bona fide purchaser for value. 18 U.S.C. § 983(d)(3)(A)(i). "The civil-forfeiture statute, 18 U.S.C. § 983, does not provide a definition of 'bona fide purchaser for value,' so courts have borrowed the definition from the Continuing Criminal Enterprise Act, 21 U.S.C. § 853(n)(6)(B)." United States v. Contents of Smith Barney Citigroup Account No. 34-19, 482 F. App'x 134, 137 n.2 (6th Cir. 2012); see United States v. Real Prop. Located at 148 Maunalanikai Place in Honolulu, Hawaii, No. CIV. 07-00049 HG LEK, 2008 WL 3166799, at *10 (D. Haw. Aug. 6, 2008) ("The bona fide purchaser provision in § 983(d)(3)(A) is virtually identical to the bona fide purchaser provision in the criminal drug forfeiture statute, 21 U.S.C. § 853(n)(6)(B), and the body of law interpreting the bona fide purchaser requirement in criminal forfeiture cases is applicable in interpreting § 983(d)(3)(A)."). In that context, the United States Court of Appeals for the Eleventh Circuit has stated that a bona fide purchaser for value "means that the only assets that are potentially immunized from forfeiture are those for which value has been given." United States v. McCorkle, 321 F.3d 1292, 1295 n.4 (11th Cir. 2003) (emphasis in original) (stating that "[t]he 'value' given by an attorney is the performance of legal services that have already been rendered when the attorney receives payment," that the claimant in that case "was paid for the rendition

of <u>future</u> legal services," and that therefore the claimant was not a bona fide purchaser for value (emphasis in original)); <u>see</u> <u>United States v. Watkins</u>, 320 F.3d 1279, 1283 (11th Cir. 2003) ("Although we have not previously addressed this question, we agree with the majority view that unsecured or general creditors cannot be considered bona fide purchasers for value within the meaning of § 853(n)(6)(B)."); <u>United States v. Reckmeyer</u>, 836 F.2d 200, 208 (4th Cir. 1987) (stating that the term includes "all persons who give value . . . in an arms'-length transaction with the expectation that they would receive equivalent value in return."). While "a person who receives property subject to forfeiture as a 'gift' cannot be a bona fide purchaser for value," <u>United States v. Brown</u>, 509 F. Supp. 2d 1239, 1246 (M.D. Fla. 2007), the term "bona fide purchaser for value must be construed liberally to include all persons who give value . . . in an arms'-length transaction with the expectation that they would receive equivalent value in return." <u>United States v. Cox</u>, 575 F.3d 352, 356 (4th Cir. 2009) (internal quotations omitted) (speaking of the criminal forfeiture statute); <u>see</u> <u>1990 Beechcraft</u>, 619 F.3d at 1277 ("In its Report, the House Judiciary Committee emphasized the need for a strong statutory innocent owner defense . . . ."); <u>see</u> <u>also</u> H.R. Rep. No. 106-192, at 8 (1999) (stating that the Judiciary Committee was "gravely concerned" about the need for individuals to "overcome tremendous procedural hurdles" to "prove their property was 'innocent'").

Stern argues that he took his deed to the Health Street Property in an arms'-length exchange for value. Specifically, Stern contends that Williams quit claimed the Health Street Property to Stern as payment, in whole or in part, for a $160,800 debt that Williams acknowledged he owned Stern. (Claimant Scott Stern's Motion for Summary Judgment, Doc. 37 at 7); (Claimant Stern's Response to the United States' Motion for Summary

Judgment, Doc. 51 at 11-13).  Additionally, Stern states that he transferred his interest in

MediTalk to Williams as part of the same transaction.  (Claimant Scott Stern's Motion for

Summary Judgment, Doc. 37 at 7 n.1).  Indeed, in his testimony, Stern states as follows:

> Williams later admitted to me that he had defrauded me out of
> my investments in each of these entities.
>
> Williams and I signed and executed three settlement
> agreements to settle my claims of fraud against him in
> exchange for Williams remunerating me for my losses.
>
> One of these agreements, the MediTalk Settlement
> Agreement, required Williams to pay me $160,800 in return
> for an assignment of my interest in MediTalk to Williams.
>
> Additionally, the MediTalk Settlement Agreement provided
> that, for payment of this sum in whole or in part, Williams
> would quit-claim his interest in the Health Street Property to
> me.

(Stern Decl., Doc. 37-1 ¶¶ 12-15).

> The Settlement Agreements described below, together with
> the Quit Claim Agreement, were intended to remedy acts of
> fraud perpetrated by Williams against me.
>
> . . .
>
> The Agreements were intended to unwind certain fraudulent
> transactions perpetrated by Williams against me and to
> restore to me money that Williams had taken from me by
> fraud.
>
> . . .
>
> Third, Williams and I executed a "Settlement Agreement and
> Release" related to disputes—including fraud by Williams—
> arising out of certain investments I made in Career Lynx, LLC
> ("CareerLynx") and MediTalk Devices, LLC ("MediTalk").
>
> Fourth, Williams and I executed the Quit Claim Agreement,
> attached hereto as Exhibit D. This Quit Claim Agreement
> details Williams' obligation to execute a Quit Claim Deed on
> the property commonly known as 26 Health Street, Dansville,
> NY 14437 (the "Property") in favor of me.

. . .

> Williams has also breached the MediTalk Settlement Agreement. Paragraph 1 of the MediTalk Settlement Agreement required Williams to pay $160,800.00 to me. As of the signing of this Affidavit, Williams has not made this contractually-required payment.   This debt of $160,800.00 was to be satisfied, at least in part, out of the proceeds of a sale of certain real property.   To facilitate this sale, Williams was required to quit claim the Real Property to me, a point described in more detail in Section IV below.

> In exchange for the [sic] Williams' contractual obligations described herein, I gave valuable legal consideration.   More specifically, I agreed to convey my interest the [sic] Companies to Williams.   I also agreed to settle disputed claims related to fraud.

. . .

> In signing the Quit Claim Agreement, Williams and I intended that once Williams transferred the Property to me, I would market the Property for sale and use the proceeds to satisfy some of the debt Williams owed me pursuant to the Settlement Agreements.

(Stern Aff. In Support of Default Judgment, Doc. 37-2 ¶¶ 4, 9, 16-17, 23-24, 29).

On the other hand, the United States argues that the transaction for the Health Street Property was not for valuable consideration.  Specifically, the United States argues that the transaction satisfied a pre-existing obligation that Williams owed to Stern, relating to capital investments that Stern had made in companies in which Williams was involved. (United States' Response to Claimant Scott Stern's Motion for Summary Judgment, Doc. 47 at 6).  Also, although the record establishes that Stern agreed to transfer his equity in MediTalk to Williams and not to sue Williams for fraud, the United States argues that no fact in the record attaches a value to either his ownership interest in MediTalk or the covenant not to sue.  (Id. at 6-7).  According to the Government, because the value of a person's shares in a company and the value of a lawsuit are by their very nature

speculative and prone to vacillation, such a transaction precludes status as a bona fide purchaser for value.  (Id. at 7); see also (United States' Motion for Summary Judgment, Doc. 39 at 13-15).

The United States concedes that Stern acquired the Health Street Property in exchange for antecedent debt, (United States Motion for Summary Judgment, Doc. 39 at 13) (stating that Stern "never acquired the property through a commercial transaction[,] but received it as satisfaction of a preexisting debt."); (Id.) ("The transfer did nothing more than fulfill a preexisting duty that Williams owed Scott Stern, namely the duty to pay him $160,800, the 'equal' and 'outstanding value of Stern's capital investment.'"), but argues that this transaction does not constitute the exchange of value necessary to confer status as a bona fide purchaser under 18 U.S.C. § 983(d)(3)(A)(i).  The Government's position lacks merit.

While not completely on all fours with the instant facts, the Sixth Circuit's decision in United States v. Huntington National Bank, 682 F.3d 429 (6th Cir. 2012) [hereinafter Huntington] is instructive.  In Huntington, the bank claimed that it was entitled to the proceeds of a deposit account seized by the government as part of a criminal forfeiture proceeding.  Id. at 431.  The bank argued that, as a secured creditor of the account, it qualified as a bona fide purchaser for value under 21 U.S.C. § 853(n)(6)(B).  Id. Specifically, the bank argued that it granted Cyberco a multi-million dollar line of credit, and, in exchange, Cyberco granted Huntington "'a continuing security interest and lien' in all of Cyberco's tangible and intangible personal property and rights, including 'deposit accounts.'"  Id. at 432.  After discovering fraud, the Government seized approximately $4 million in Cyberco assets, including approximately $700,000.00 from a Huntington Bank

account. Id. The bank filed a verified petition of claim in the district court, asserting that it had a right to, and a direct ownership interest in, the funds in the Cyberco account. Id. The bank claimed that, at the time it filed the petition, Cyberco remained indebted to Huntington in the amount of approximately $900,000.00, that Cyberco had defaulted on its obligations to Huntington, and that Huntington was entitled to the funds in the Cyberco account pursuant to its security agreement with Cyberco. Id. When the district court reached the merits of the bank's bona-fide-purchaser argument, it denied the bank's claim, finding that the bank was not a bona fide purchaser for value of the Cyberco Account. Id. at 433. On appeal, the Sixth Circuit reversed. The bank argued that because it purchased a valid security interest in all of Cyberco's assets by extending a line of credit and loans to Cyberco and because it was unaware of Cyberco's fraud until the funds in the account were seized, it was a bona fide purchaser for value of its security interest in the Cyberco account. Id. As it pertains to the bona fide purchaser requirement, the bank's argument was that "it is well established that one who takes a security interest in property in exchange for antecedent debt, as Huntington did, can be a BFP of that property interest." Id. at 434. The Sixth Circuit considered this argument and concluded, "[t]he bank is correct." Id. In doing so, the Sixth Circuit cited with approval a decision from the United States Court of Appeals for the Seventh Circuit, United States v. Frykholm, 362 F.3d 413 (7th Cir. 2004).

In Frykholm, Linda Frykholm persuaded people to invest approximately $15 million in a get-rich-quick scheme, which eventually resulted in a 144 month sentence. Id. at 415. Forfeiture of all assets traceable to the scam's proceeds was part of the sentence. Id. Cotswold Trading Company ("Cotswold"), one of Frykholm's victims, made a claim to

some of Frykholm's assets.  Id.  Cotswold invested approximately $1.1 million in Frykholm's scheme with an expectation of doubling its investment and, after Frykholm repeatedly failed to keep her promises, Cotswold's lawyer threatened to file suit and report Frykholm to the U.S. Attorney.  Id.  Frykholm continued to make promises, but the wire transfers never materialized and her checks bounced.  Id.  Eventually, Frykholm and Cotswold executed a settlement and release wherein Frykholm gave Cotswold a promissory note for $2.2 million due in 100 days and secured by her interest in real estate on Lake Geneva, Wisconsin.  Id.  Frykholm had purchased the property for approximately $2.3 million earlier that year, and she paid for it using 17 checks written by other victims of the scam.  Id.  The property was unencumbered until Frykholm gave Cotswold the mortgage.  Id.  The Government had originally argued that a mortgage given in exchange for an antecedent debt could not be a bona fide purchase for value, but it later abandoned that position.  Id. at 416.  The Seventh Circuit noted that the Government astutely opted to forego the argument because it was not correct: "The United States questions whether the holder of a security interest given in exchange for an antecedent debt can be a bona fide purchaser for value but has not pursued the point—sensibly so."  Id.  In so stating, the Seventh Circuit cited Swift v. Tyson, 41 U.S. (16 Pet.) 1 (1842), overruled on other grounds Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), a decision from the United States Supreme Court, in which the Court recognized that one can be a bona fide purchaser of property in exchange for "what the law deems a good and valid consideration, that is, for a preexisting debt."  Id. at 16 (emphasis added).

United States v. Petters, 857 F. Supp. 2d 841, 843 (D. Minn. 2012) is in accord. In Petters, Crown Bank filed three verified petitions, asserting interests in certain property

previously owned by the defendant and forfeited to the Government. Id. With respect to two of the properties — the Plymouth property and the Keystone property — Crown alleged that it had loaned money to the defendant pursuant to a promissory note. Id. Subsequently, "'for value received and in consideration of existing debt and contemplated forbearance on' its right under that note, Defendant executed a mortgage on the Plymouth Property, and a Deed of Trust for the Keystone Property, in favor of Crown." Id. The Government argued, similarly to its argument here, that at the time the defendant signed the mortgage and deed of trust, he was already indebted to Crown, thereby turning his unsecured debt into secured debt. Id. at 846. According to the Government, "acquiring security for a preexisting debt does not constitute a bona fide purchase." Id. The Petters court did not agree, and said so explicitly. Id. ("The Court does not agree."). The court looked to Minnesota law[7] to address the Government's argument that Crown could not have been a bona fide purchaser for value simply because it received the mortgage and deed of trust as security for prior loans to the defendant. Id. Citing Minn. Stat. § 336.1-204(2), the court found that valuable consideration includes "security for . . . a preexisting claim." Id. As such, the court "reject[ed] the Government's argument that Crown was not a bona fide purchaser for value simply because it obtained the Mortgage and Deed of

---

[7] Neither of the parties here argue that state law applies. Indeed, the United States explicitly states in its Motion for Summary Judgment that "[a]lthough the meaning of 'bona fide purchaser' is a matter of federal law, the courts may also look to state commercial law as persuasive guidance in ascertaining its meaning, and have done so." (United States' Motion for Summary Judgment, Doc. 39 at 10). While discussing federal law in a footnote, the Petters court relied on Minn. Stat. § 336.1-204(2) for its conclusion that valuable consideration under Minnesota law includes security for a preexisting claim. 857 F. Supp. 2d at 846, 847 n.4. Significantly, here, New York commercial law has a substantially similar provision, which in pertinent part, states as follows: "[A] person gives value for rights if the person acquires them . . . as security for, or in total or partial satisfaction of, a preexisting claim." N.Y. U.C.C. § 1-204(b) (McKinney 2014).

Trust as security for preexisting debts." Id. at 847. Importantly, in a footnote, the Petters court stated that "the Government would not prevail even were the Court to accept its argument that Crown's status as a bona fide purchaser must be determined under federal law." Id. at 847 n.4. The court then cited Swift, 41 U.S. (16 Pet.) 1 and Frykholm, 362 F.3d 413 for the proposition that both cases "suggest that the Government is wrong." Id. (emphasis omitted); see also United States v. Bond, No. 6:13-CR-03103-MDH-2, 2015 WL 403102, at *7 n.10 (W.D. Mo. Jan. 28, 2015) (citing Huntington, Frykholm, and Petters for the proposition that federal law supports the conclusion "that a secured creditor can qualify as a bona fide purchaser for value, despite not having 'purchased' the property itself.").

Applying the foregoing authorities, Stern acquired title to the Health Street Property in exchange for value. Specifically, Stern swapped antecedent debt or a preexisting claim in the amount of $160,800 for payment, in whole or in part, for the Health Street Property. Under either Federal law, see Swift, 41 U.S. (16 Pet.) 1; Huntington, 682 F.3d 429; Frykholm, 362 F.3d 413; Petters, 857 F. Supp. 2d at 847 n.4; or New York law, see N.Y. U.C.C. § 1-204(b),[8] this exchange makes Stern eligible for bona fide purchaser status. Like in Frykholm, where Cotswold acquired an interest in property in exchange for an antecedent debt, Stern acquired title to the Health Street Property in exchange for a $160,800 debt that Williams acknowledged. (Stern Decl., Doc. 37-1 ¶¶ 12-15); (Stern Aff. In Support of Default Judgment, Doc. 37-2 ¶ 4, 9, 16-17, 23-24, 29). Also, like the decision in Petters — where Crown acquired an interest in two pieces of real property in exchange for an existing debt — the Court rejects the United States' argument that Stern is not a

---

[8] This provision was formerly cited as N.Y. U.C.C. § 1-201(44)(b).

bona fide purchaser for value simply because he obtained title to the Health Street Property in exchange for a preexisting debt. Here, Stern gave value for the Health Street Property, which is what is required under Eleventh Circuit law. McCorkle, 321 F.3d at 1295 n.4 (stating that a bona fide purchaser for value "means that the only assets that are potentially immunized from forfeiture are those for which value has been given." (emphasis in original)).[9]

Finally, the United States does not appear to seriously contend that Williams failed to purchase the property in an "arms'-length transaction." (United States' Motion for Summary Judgment, Doc. 39 at 9-10, 13-15). The Government cites no facts to suggest collusion or that the property was merely a gift. Indeed, all the facts suggest that Stern and Williams were each negotiating for individual benefits, and neither was acting for the protection of the other. Particularly relevant, when Williams failed to comply with his obligations under the settlement agreements, Stern sued Williams in federal district court and obtained a default judgment in his favor. (Order Taking Judicial Notice of Certain Facts, Doc. 27 at 2; Default Judgment, Doc. 24-2). No facts establish or even suggest that the agreement reached was feigned, fictitious, or otherwise not the product of two sophisticated businessmen negotiating in their own self-interest.

---

[9] The Court's conclusion — specifically, that the undisputed facts establish that Stern is a bona fide purchaser for value because Williams quit claimed the Health Street Property to Stern as payment, in whole or in part, for a $160,800 debt that Williams acknowledged he owed Stern — obviates the need for the Court to determine whether Stern's transfer of his interest in MediTalk to Williams or his agreement to forego an action for fraud also constitute value sufficient to confer bona fide purchaser status.

In conclusion, at the time that Stern acquired his interest in the Health Street Property, he was a bona fide purchaser for value within the meaning of 18 U.S.C. § 983(d)(3)(A)(i).

**D.    Stern did not know and was reasonably without cause to believe that the property was subject to forfeiture.**

This is a case in which Stern's property interest was acquired "after the conduct giving rise to the forfeiture has taken place" — that is, Stern acquired title to the Health Street Property <u>after</u> Williams' alleged fraudulent conduct. 18 U.S.C. § 983(d)(3)(A). The United States concedes as much. <u>See</u> (United States' Motion for Summary Judgment, Doc. 39 at 3 n.2) ("As discussed herein, the burden is on Stern in this case to show that he was a bona fide purchaser for value of the subject property, since, under 18 U.S.C. § 983(d)(A) his claimed property interest arose after the conduct giving rise to the forfeiture took place. That is, Williams quit claimed the Health Street Property to Stern after the fraud took place."). That determination is critical because it determines the statutory requirement that Stern must meet.

18 U.S.C. § 983 differentiates between "a property interest in existence at the time the illegal conduct giving rise to forfeiture took place," 18 U.S.C. § 983(d)(2)(A), and "a property interest acquired after the conduct giving rise to the forfeiture has taken place," 18 U.S.C. § 983(d)(3)(A). If the former applies, it requires an individual claiming innocent owner status to show that he "did not know of <u>the conduct giving rise to forfeiture</u>." 18 U.S.C. § 983(d)(2)(A)(i) (emphasis added). But that is not what Stern must show. Stern does not fall under 18 U.S.C. § 983(d)(2)(A) because, as the Government concedes, his property interest was not in existence at the time the illegal conduct giving rise to the forfeiture took place. Rather, Stern's interest was acquired after the alleged fraud took

- 32 -

place, and, as such, he falls under 18 U.S.C. § 983(d)(3)(A).  Consequently, Stern must meet a different requirement.  That requirement is that he "did not know and was reasonably without cause to believe that the property was subject to forfeiture."  18 U.S.C. § 983(d)(3)(A)(ii) (emphasis added).

To further understand the knowledge necessary — or rather, the lack thereof — in order for Stern to satisfy this requirement, it is helpful to consider what the term "subject to forfeiture" means.  Fortunately, Congress provided a definition.  18 U.S.C. § 981(a)(1) defines "subject to forfeiture" for purposes of the Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202, which added the innocent owner defense codified at 18 U.S.C. § 983(d)(3)(A).  As applicable here, 18 U.S.C. § 981(a)(1) states that the following property is "subject to forfeiture" to the United States: (A) any property, real or personal, "involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property," 18 U.S.C. § 981(a)(1)(A); and (C) any property, real or personal "which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)," 18 U.S.C. § 981(a)(1)(C).  As such, Stern's rephrased burden is to establish that he was ignorant of the fact that the Health Street Property was involved in, traceable to, or derived from proceeds traceable to a criminal violation.  See United States v. An Interest in the Real Prop. Located at 2101 Lincoln Blvd., Los Angeles, Cal., 729 F. Supp. 2d 1150, 1154 (C.D. Cal. 2010) (rejecting the argument that, under section 983(d)(3)(A), "a person is an innocent owner so long as he or she is ignorant of the laws that authorize the Government to forfeit property connected to certain criminal activity," and stating that "[i]n [cases under section 983(d)(3)(A)], to defeat the innocent

- 33 -

owner defense, the claimant must know that the property is 'subject to forfeiture;' as explained above, this requires knowledge that the property the claimant is about to acquire is <u>traceable to or was involved in criminal activity</u>." (emphasis in original)). His burden is not to show that he was ignorant of Williams' alleged fraudulent conduct.

The Fourth Circuit's decision in <u>United States v. Reckmeyer</u> is instructive. 836 F.2d 200 (4th Cir. 1987). In <u>Reckmeyer</u>, Christopher pled guilty to conducting a criminal enterprise and, in connection with his plea, agreed to forfeit virtually all of his assets, both discovered and undiscovered. <u>Id.</u> at 202. His father successfully petitioned the district court to modify the forfeiture order to exclude a piece of property that the father had purchased from Christopher. <u>Id.</u> The father successfully argued that he fell under the provision that grants relief to an individual if that individual is "a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section." <u>Id.</u> at 203-04. On appeal, the government conceded that the father was a "bona fide purchaser" of the property, but contested the district court's determination that the father was reasonably without cause to believe that the property was subject to forfeiture. <u>Id.</u> at 204. To support its assertion, the government contended that the father knew Christopher was under a grand jury investigation prior to the purchase of the property, and that proceeds of the sale of real estate belonging to Christopher's brother had been seized in a civil forfeiture action prior to the father's purchase of the property. <u>Id.</u> Additionally, government agents told the father that they were investigating his financial transactions with his sons, and Christopher told his father that the investigations concerned tax problems. <u>Id.</u> The government argued that "[the father's] admitted

knowledge that his sons were under investigation and that some proceeds from the sale of property owned by [Christopher's brother] had been seized compels, as a matter of law, the conclusion that [the father] was not reasonably unaware of the forfeitability of" the property at issue.  Id. at 204.  The Fourth Circuit rejected this argument, stating as follows:

> We disagree. A reasonable person with the knowledge the government attributed to William would not necessarily conclude that <u>all property</u> owned by Christopher was forfeitable. The events known by William were susceptible to a number of interpretations. Understandably, he may not necessarily have assumed the worst from the limited information available to him. <u>Indeed it would have required no small amount of imagination and parental mistrust to assume from knowledge of the investigation and seizure of some of Robert's funds that all of Christopher's assets were subject to forfeiture.</u>

Id. at 204-05 (emphasis added).  As such, the Fourth Circuit affirmed.

Applying the foregoing authorities, Stern has established that he "did not know and was reasonably without cause to believe that the [Health Street Property] was subject to forfeiture," 18 U.S.C. § 983(d)(3(A)(ii), and the United States has failed to create a factual dispute on this point.  At first blush, the United States' position appears to be that "Stern is not entitled to summary judgment because the material facts show he had reasonable cause to believe the defendant property was subject to forfeiture." (United States' Response to Scott Stern's Motion for Summary Judgment, Doc. 47 at 8).  But the United States cites no facts to establish or even suggest that Stern knew — or even had reasonable cause to know — that <u>the property</u> was subject to forfeiture.  In fact, the Government does not even argue that Stern had reasonable cause to believe that the Health Street Property was subject to forfeiture when he acquired title to it.  Rather, the United States argues that "[t]he record is replete with facts showing that Stern knew of

the conduct that gave rise to the defendant property's forfeiture," (id.) (emphasis added);

it argues that "[t]he record is incontrovertible in establishing that Stern knew of Williams'

fraudulent conduct before he acquired the defendant property, and therefore the

Government—and not Stern— is entitled to summary judgment on the innocent-owner

defense," (id. at 10) (emphasis added); it argues that "[e]ven if Scott Stern is a bona fide

purchaser, he is still not an innocent-owner because he knew—or at a minimum had

reasonable cause to know—of the conduct that gave rise to the forfeiture of the defendant

property," see (United States' Motion for Summary Judgment, Doc. 39 at 15) (emphasis

added)).  Of course, that is not the relevant standard.  See 18 U.S.C. § 983(d)(3)(A)(ii);

Reckmeyer, 836 F.2d at 204-05; An Interest in the Real Prop. Located at 2101 Lincoln

Blvd., Los Angeles, Cal., 729 F. Supp. 2d at 1154.  The United States cites fact after fact

showing that Stern was aware of Williams' conduct prior to acquiring title to the Health

Street Property:

> "On May 17th and May 18th 2013, Williams and I entered into three (3) Settlement Agreements, together with a Quit Claim Agreement." Doc. 39-1, at ¶ 7.
>
> "The Agreements were intended to unwind [the] fraudulent transactions perpetrated by Williams against me . . . ." Id. at ¶ 9.
>
> "The Settlement Agreements . . . together with the Quit Claim Agreement, were intended to remedy acts of fraud perpetrated by Williams against me. Williams' fraud is described more fully in the Complaint filed in this Action." Id. at ¶ 4.
>
> "Williams executed the Quit Claim Deed on or about August 23, 2013." Id. at ¶ 31.

(United States' Response to Scott Stern's Motion for Summary Judgment, Doc. 47 at 9).

But those facts do not satisfy the applicable standard.  No one disputes that Stern had

knowledge of Williams' fraudulent conduct when he acquired title to the Health Street Property because it does not matter.  See 18 U.S.C. § 983(d)(3)(A)(ii).  The proper inquiry is whether Stern had reasonable cause to believe that the Health Street Property was "subject to forfeiture" — i.e., whether Stern was ignorant of the fact that the Health Street Property was involved in, traceable to, or derived from proceeds traceable to a criminal violation.  18 U.S.C. § 983(d)(3)(A); 18 U.S.C. § 981(a)(1)(A), (C); see An Interest in the Real Prop. Located at 2101 Lincoln Blvd., Los Angeles, Cal., 729 F. Supp. 2d at 1154; see also Reckmeyer, 836 F.2d at 204-05.  All of the undisputed evidence before the Court shows that Stern had no such knowledge.  In his Declaration, Stern states as follows:

> 19. Throughout this time, I believed that Williams's ownership of the Health Street Property was entirely unrelated to any of his fraudulent activities.
>
> 20. I also did not believe or know that Williams had used money from any of his frauds to purchase the Health Street Property.
>
> 21. It was my understanding that Williams was a wealthy man who had other funds available and that he used these other funds to purchase the Health Street Property.
>
> 22. Although Williams admitted to me that he had defrauded me, he never told me that he had used funds from me or his other investors to buy the Health Street Property.
>
> 23. The first indication I had that Williams had purchased the Health Street Property with funds tainted by fraud was after I learned that the Government had initiated this civil forfeiture action on October 7, 2013.

(Stern Decl., Doc. 37-1 ¶¶ 19-23).  These are the relevant facts; they establish whether Stern knew or had reasonable cause to believe that the Health Street Property was subject to forfeiture.  18 U.S.C. § 983(d)(3)(A)(ii).  According to these facts, he did not.  The United States cites nothing to the contrary.  "A reasonable person with the knowledge

the government attributed to [Stern] would not necessarily conclude that all property owned by [Williams] was forfeitable." Reckmeyer, 836 F.2d at 204-05. Stern's knowledge of Williams' fraudulent conduct did not place him on notice that every piece of property, real or personal, wherever situated, whenever acquired, and however held, was subject to forfeiture.

Consequently, the undisputed facts establish that Stern satisfies the second element of the innocent-owner defense — he "did not know and was reasonably without cause to believe that the [Health Street Property] was subject to forfeiture." 18 U.S.C. § 983(d)(3)(A)(ii).[10]

---

[10] Nor do the Government's cases lend it any support. In An Interest in the Real Prop. Located at 2101 Lincoln Blvd., Los Angeles, Cal., the court stated that "to defeat the innocent owner defense, the claimant must know that the property is 'subject to forfeiture;' . . . this requires knowledge that the property the claimant is about to acquire is traceable to or was involved in criminal activity." 729 F. Supp. 2d at 1154 (emphasis removed).   The court did not hold or even suggest that a claimant is aware or has reasonable cause to believe that property is forfeitable merely "when he knows of the conduct that gives rise to forfeiture." (United States' Response to Scott Stern's Motion for Summary Judgment, Doc. 47 at 4).   Quite the contrary.   In United States v. 198 Training Field Rd., the court concluded that, because the claimant knew soon after her son's arrest and before the conveyance at issue that police searched the defendant property, seized large amounts of drugs from the property, and arrested her son for cocaine trafficking, "she was not reasonably without cause to believe that the defendant property was subject to forfeiture." No. CIV.A. 02-11498-GAO, 2004 WL 1305875, at *3 (D. Mass. June 14, 2004).   There, based on the facts presented, the claimant had reasonable cause to believe that the property was subject to forfeiture.   In United States v. Funds From First Reg'l Bank Account No. XXXXX1859 Held in Name of R K Co., the court concluded that a claimant tobacco wholesaler failed to show that it was not reasonably without cause to believe that property was subject to forfeiture because the knowledge of cigarette taxing requirements can be presumed among those dealing in large quantities of cigarettes, and the cigarettes at issue were unstamped. 639 F. Supp. 2d 1203, 1214-15 (W.D. Wash. 2009). There too, based on those facts, the claimant had reasonable cause to believe that the property was subject to forfeiture.   Likewise, United States v. 392 Lexington Parkway South, St. Paul, Minn., Ramsey County., 386 F. Supp. 2d 1062 (D. Minn. 2005) stands for the unremarkable proposition that a government lis pendens — stating "the purpose of this action is for the forfeiture of the defendant real property" — provides a claimant notice that the property is subject to forfeiture.   Id. at

## IV.    CONCLUSION

In sum, the undisputed facts establish the following.  Stern has both Article III and statutory standing to assert his claim to the Health Street Property.  Stern is an owner of the Health Street Property within the meaning of 18 U.S.C. § 983(d)(6).  At the time he acquired his interest, Stern was a bona fide purchaser for value of the Health Street Property within the meaning of 18 U.S.C. § 983(d)(3)(A)(i).  At the time he acquired his interest, Stern did not know and was reasonably without cause to believe that the Health Street Property was subject to forfeiture, pursuant to 18 U.S.C. § 983(d)(3)(A)(ii).  Consequently, Stern's interest in the Health Street Property "shall not be forfeited under any civil forfeiture statute."  18 U.S.C. § 983(d)(1).

In light of the foregoing, it is

**ORDERED:**

1. Claimant Scott Stern's Motion for Summary Judgment [Doc. 37] is **GRANTED**.

2. The United States' Motion for Summary Judgment [Doc. 39] is **DENIED**.

---

1071 (D. Minn. 2005) ("The Government's notice of lis pendens provided notice to Claimants as a matter of law that the property was subject to forfeiture.").  Again, based on the facts at issue there, the claimants had at least reasonable cause to believe at the property was subject to forfeiture.  Finally, in United States v. Real Prop. Located & Situated at 404 W. Milton St., Austin, Travis County, Texas, the court held that a minor child could not take refuge in the "primary residence exception" of 18 U.S.C. § 983(d)(3)(B) because he did not have an "otherwise valid claim" under 18 U.S.C. § 983(d)(3)(A).  No. A-13-CA-194-SS, 2014 WL 5808347, at *8-9 (W.D. Tex. Nov. 7, 2014).  The court reasoned that, among other indicators of the underlying illicit conduct, the claimant's property interest vested after the government filed its initial lis pendens on the property, thereby placing "all persons, including [the claimant], on notice [that the property] was subject to forfeiture."  Id. at *8 (brackets in original omitted).  In contrast, here, the United States has pointed to no facts to suggest that Stern knew or had reasonable cause to believe that the Health Street Property was subject to forfeiture. Knowledge of Williams' alleged conduct alone simply will not do.

3. The United States of America's forfeiture claim against Defendant Real Property, including all improvements thereon and appurtenances thereto, located at 26 Health Street, Dansville, Livingston County, New York, is **DISMISSED with prejudice**.

4. The Clerk of the Court is **DIRECTED** to terminate any pending motions as moot and to close the file.

**DONE** and **ORDERED** in Jacksonville, Florida this ___13th___ day of July, 2015.

BRIAN J. DAVIS
United States District Judge

mg/p
***Copies furnished to:***

Counsel of Record